UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARTHUR and MARGARET
BOUGADES, parents of a disabled child,
M.B.,

                              Plaintiffs,

                -against-

PINE PLAINS CENTRAL SCHOOL
DISTRICT,

                              Defendant.

**MEMORANDUM OPINION
AND ORDER**

05 Civ. 02861 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            In this action, Plaintiffs seek reimbursement under the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., for their son M.B.'s

tuition at the Kildonan School for the 2003-2004 school year.  Plaintiffs assert that they

are entitled to tuition reimbursement because Defendant Pine Plains Central School

District (the "District") failed to provide M.B., who has a learning disability, with an

appropriate individualized education program ("IEP")[1] for the 2003-2004 school year.

(Cmplt. ¶¶ 2, 15-18, 57-59)  The parties have cross-moved for summary judgment on

Plaintiffs' claim.  For the reasons stated below, Plaintiffs' motion (Docket No. 15) is

GRANTED, and Defendant's motion (Docket No. 19) is DENIED.

_____

[1] The IEP is a document provided for in the IDEA "in which the particular educational
needs of a disabled child and the services required to meet those needs are set forth at
least annually."  Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch.
Dist., 386 F.3d 158, 160 (2d Cir. 2004) (internal quotations omitted); see also 20 U.S.C.
§1401(14) (defining "IEP" as a "written statement for each child with a disability that is
developed, reviewed and revised in accordance with" 20 U.S.C. § 1414(d)).

## DISCUSSION

"Under the IDEA, 'states receiving federal funds are required to provide "all children with disabilities" a "free appropriate public education."'" <u>R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist.</u>, 615 F. Supp. 2d 283, 287 (S.D.N.Y. 2009) (quoting <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 107 (2d Cir. 2007) (quoting IDEA)). "A free appropriate public education ('FAPE') must provide 'special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits.'" <u>Id.</u> (quoting <u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 122 (2d Cir. 1998)). "These services are administered through a written individualized education program ('IEP'), which must be updated at least annually." <u>Id.</u>

"Parents who believe that the state has failed to provide . . . [a FAPE] may pay for private services and seek reimbursement from the school district for 'expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP.'" <u>T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.</u>, 554 F.3d 247, 252 (2d Cir. 2009) (internal citation omitted). Tuition reimbursement is warranted where "(i) the services offered by the state were inadequate or inappropriate, (ii) the services selected by the parents were appropriate, and (iii) equitable considerations support the parents' claim." <u>R.R. ex rel. M.R.</u>, 615 F. Supp. 2d at 292.

"The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers." <u>Walczak</u>, 142 F.3d at 129. Plaintiffs here brought an administrative claim asserting that M.B.'s proposed IEP for 2003-04 would not provide a FAPE, and seeking tuition reimbursement after unilaterally placing M.B. at the Kildonan

School for the 2003-04 school year.  Plaintiffs' claim was rejected by an impartial

hearing officer ("IHO"), whose decision was sustained on administrative appeal by a

New York State Review Officer ("SRO").  (See Pltf. Rule 56.1 Stat. ¶¶ 71-72; Def. Rule

56.1 Stat. ¶¶ 9, 11)  Plaintiffs then filed this action seeking reversal of the administrative

decisions.

        The sole issue before this Court in deciding the parties' summary

judgment motions is whether Plaintiffs have established the first element of the test for

tuition reimbursement – i.e., that the services offered by the District in the 2003-04 IEP

were inadequate or inappropriate.[2]  In deciding this issue, the Court must first "examine

whether the [District] has complied with the procedures set forth in the IDEA," and

second "consider whether the proposed IEP is substantively appropriate in that it is

'reasonably calculated to enable the child to receive educational benefits.'"  T.P. ex rel.

S.P., 554 F.3d at 252, quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct.

3034 (1982).  Plaintiffs "bear the burden of persuasion as to the inappropriateness of . . .

[the challenged] IEP. . . ."  Id.[3]

_____

[2] Defendant does not dispute that the Kildonan School was an appropriate placement, nor
does it argue that equitable considerations support denying tuition reimbursement.  (See
Def. Br. at 2-3 (stating that "the only issue" presented by the parties' motions is whether
M.B.'s 2003-04 IEP was appropriate))

[3] The IHO and SRO assumed that the District had the burden of showing that the 2003-04
IEP was appropriate.  (Tr. 4:8-11)  After the IHO and SRO issued their decisions,
however, the Supreme Court clarified that the party seeking relief under the IDEA has the
burden of persuasion.  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62, 126 S.Ct. 528
(2005).  Therefore, in deciding the pending motions, the Court must "analyze the
evidence differently tha[n] the IHO and SRO did, and place on the parents the burden of
proving the inadequacy of the IEP in the first instance."  Matrejek v. Brewster Cent. Sch.
Dist., 471 F. Supp. 2d 415, 426 (S.D.N.Y. 2007).

I.      **FACTS**[4]

   M.B. began attending school in the District in 1999.  (Def. Rule 56.1 Stat.

¶ 2)  During each school year from 1999-2000 through 2002-03, M.B. was classified as

learning disabled due to reading and language difficulties stemming from dyslexia, and

was provided with an IEP.  (Id.; Ex. 17 at 1 (2002-03 IEP (describing disability)); Ex. 16

at 5 (neurological and educational evaluation stating that "test results indicate a clinical

diagnosis of Dyslexia"))

  A.      **Services Provided to M.B. in 2002-03**

   M.B.'s 2002-03 IEP states that he would receive one reading intervention

period per week, one writing intervention period per week, and five resource room

periods per week for multi-sensory reading.[5]  (Ex. 17 at 1, 4)  It also provides for various

program modifications, including a reduction in the length of assignments.  (Id. at 1

(listing "reduce length of assignments" under "Program Modifications"))

   The services M.B. received in 2002-03, however, varied somewhat from

the program described in the 2002-03 IEP.  Instead of having one resource room period

per day, M.B. received four or five periods per day of "inclusion" programming with

direct classroom support.[6]  (Pltf. Rule 56.1 Stat. ¶¶ 38-39)  He also received one hour per

---

[4] Unless otherwise noted, the facts in the cited paragraphs from the parties' Rule 56.1 statements are either admitted in the corresponding paragraph of the opposing Rule 56.1 Response or were not controverted by citations to admissible evidence.

[5] "Multi-sensory reading" is a methodology that incorporates "other ways of learning words than by just looking at them."  (Ex. YY at 1)  For instance, "[a]s the student writes a letter, he or she says the name or the sound."  (Id. at 2)

[6] During M.B.'s English and math classes, a special education teacher assisted him in the classroom, and during M.B.'s social studies and science classes, a teacher assistant performed the same function.  (Pltf. Rule 56.1 Stat. ¶ 28)

week of one-to-one multi-sensory reading tutoring at his home.[7]  (Id. ¶ 38)  And for the

first few months of the 2002-03 school year, M.B. attended multi-sensory reading for one

period every day, but did not attend a separate writing intervention period.[8]  (Pltf. Rule

56.1 Stat. ¶ 38; Def. Rule 56.1 Response ¶ 38; Tr. 117:4-120:20 (testimony of District

witness that M.B. did not participate in a separate writing intervention period in 2002-

03))  After November 1, 2002, M.B. was taken out of his multi-sensory reading class on

alternate days and placed in a separate writing intervention class.  (See Ex. BB at 5 & Tr.

309:14-15 (multi-sensory reading teacher stating that beginning November 1, M.B.

worked with her only every other day); Tr. 787:15-788:15 (Plaintiff Margaret Bougades

testifying that M.B. began attending multi-sensory reading every other day and writing

intervention every other day))

---

[7] In their Rule 56.1 Statement and Response, Plaintiffs assert, and Defendant admits, that
M.B. received two hours per week of one-on-one reading tutoring at home during the
2002-03 school year.  (Pltf. Rule 56.1 Stat. ¶ 38; Def. Rule 56.1 Response ¶ 38)  The
evidence cited by Plaintiffs supports the proposition that the District agreed to provide
two hours of tutoring per week at a rate of $26 per hour during the 2002-03 school year.
(Ex. 28)  However, Plaintiff Margaret Bougades testified that M.B. actually received only
one hour of tutoring per week, because $26 was less than half of his tutor's hourly fee.
(Tr. 801:2-10)  This testimony was accepted by the IHO (IHO Dec. at 23), and is also
consistent with documentary evidence in the record.  (Ex. W (Dec. 4, 2002 letter from
Margaret Bougades to District stating that M.B. was receiving "only 2 half hour sessions
a week, which is only one hour a week of tutoring," from his reading tutor))

[8] Defendant purports to dispute Plaintiffs' Rule 56.1 Statement ¶ 38 to the extent it states
that M.B. received "42 minutes 'multi-sensory reading and writing daily in a small
group.'"  (Def. Rule 56.1 Response ¶ 38)  However, it appears undisputed that M.B.
received one multi-sensory reading class each day that also addressed writing, and did not
attend a separate writing class daily.  In a December 10, 2002 letter to Plaintiffs, the
District stated that "[t]he multi-sensory reading program (Mrs. Koch) focuses on reading
and writing daily in a small group setting."  (Pltf. Rule 56.1 Stat. ¶ 38; Ex. 27)  The
testimony Defendant cites confirms that M.B. attended multi-sensory reading instruction
daily, but did not attend a separate writing intervention period.  (Tr. 85:7-24 (describing
M.B.'s sixth grade schedule as including daily multi-sensory reading with Mrs. Koch),
86:22-24, 94:9-11 ("multi-sensory reading generally incorporates writing"); 117-120
(M.B. did not have a separate writing intervention))

During the first half of 2002-03, M.B., like other students, was required to attend after-school study hall to receive homework assistance when he had failed to complete earlier homework assignments.  (Pltf. Rule 56.1 Stat. ¶¶ 36, 38; Tr. 405-07 (Pine Plains Principal Hess explaining purpose of after-school study hall))  The school stopped requiring M.B. to attend study hall, however, after Plaintiffs requested on various occasions that he be excused.  (Tr. 412 (Principal Hess decided that M.B. would not be required to attend after-school study hall after repeated requests by M.B.'s parents that he be excused); see also Ex. BB at 10 (Plaintiff Arthur Bougades stating "I had stopped after school detention for not completing homework because he is too stressed out"))

**B.    Development of the 2003-04 IEP**

On March 18, 2003, the District's Committee on Special Education ("CSE")[9] met "to approve a program for [2003-04] . . . and to determine modifications for [M.B.'s] IEP."  (Pltf. Rule 56.1 Stat. ¶ 51; Ex. 44 at 1)  The CSE reviewed the results of the Terra Nova standardized test that M.B. had taken on January 27, 2003, which showed "slight regression" in reading.  (Pltf. Rule 56.1 Stat. ¶ 53; Ex. 44 at 1)  However, "[n]o objective measures of basic reading skills," such as decoding, were "conducted, considered or reviewed."  (Pltf. Rule 56.1 Stat. ¶ 53)

At the meeting, several of M.B.'s teachers gave informal assessments of his performance.  (See Pltf. Rule 56.1 Stat. ¶¶ 53, 55)  Although M.B.'s science teacher

---

[9] "New York . . . charges local Committees on Special Education ('CSE's') with the responsibility of formulating the IEPs.  Each CSE is comprised of, among other people, the child's parent or guardian, the child's regular education teacher, the child's special education teacher, a school psychologist, and 'an additional parent member of a student with a disability residing in the school district or a neighboring school district.'" R.R. ex rel. M.R., 615 F. Supp. 2d at 287, quoting 8 N.Y.C.R.R. 200.3(a)(1).

stated that he was a "good student" and "does well" (Ex. 44 at 2), M.B.'s other teachers gave uniformly negative appraisals of his educational performance that year.  M.B.'s multi-sensory reading teacher stated that "everything was going along fine" until M.B.'s daily multi-sensory reading class was modified to every other day.  (Id. at 2-3)  She identified M.B.'s "weakest area" as "writing and spelling."  (Id. at 2)  M.B.'s writing teacher reported that M.B. absorbed concepts quickly, but that his "biggest problems" and "downfall" were in the areas of editing and spelling.  (Id. at 4)  M.B.'s special education teacher also stated that she was "concerned about his writing abilities."  (Id. at 1)  M.B.'s reading skills teacher reported that M.B.'s interim grade was 64 and that his "[h]omework is failing at this point" because of incomplete assignments.  (Id. at 4; Ex. BB at 1, 9-10)  M.B.'s English teacher stated that she saw "a lack of effort in the homework," with numerous incomplete assignments, and that M.B. had recently failed a test and a quiz.  (Ex. 44 at 5)  M.B.'s social studies teacher similarly reported that M.B. had failed to complete several recent homework assignments and that his grades on others ranged from 50 to 78.  (Id. at 5-6 (reporting comments of Mr. Ray); Ex. 23 (identifying Ray as social studies teacher))

After M.B.'s teachers spoke, Assistant Superintendent Steve Throne commented that M.B. "has been passing his courses up through most of the year and now we are currently on a downside."  (Ex. 44 at 7)  Plaintiffs requested "progress reports for the school year," but were told that these had not yet been completed, and that the review of IEP goals and objectives "ha[d] not been done formally."  (Pltf. Rule 56.1 Stat. ¶ 55; Ex. 44 at 8)  Plaintiffs also requested approval for an independent educational evaluation, which was denied.  (Pltf. Rule 56.1 Stat. ¶ 54; Ex. 44 at 3)

7

The CSE agreed to recommend – for the 2003-04 school year – that M.B. receive both remedial writing and multi-sensory reading instruction five times per week. (Ex. 44 at 1-2, 8)  Although the CSE discussed testing modifications and agreed to recommend that M.B. be given additional time to complete tests, the CSE did not make any suggestions for program modifications relating to homework completion or after-school study hall attendance.  (Id. at 7-8)  At the conclusion of the meeting, Assistant Superintendent Throne stated that M.B.'s recommended program would consist of four "inclusion" periods with classroom support per day, one period of multi-sensory reading per day, and one period of writing intervention per day.  (Id. at 8)

### C. June 2003 Assessments of M.B.'s Performance

In June 2003, Plaintiffs received fourth quarter notes from M.B.'s Remedial Reading teacher, who reported that M.B.'s "reading fluency has improved." (Pltf. Rule 56.1 Stat. ¶ 56 & Ex. 9)  Plaintiffs also received a progress report concerning 29 "short-term" goals set forth in M.B.'s 2002-03 IEP.  (Ex. 50)  M.B. had mastered or made satisfactory progress with respect to only two goals – one relating to transitioning from room to room within the school building and one relating to transitioning between classroom tasks.  (Pltf. Rule 56.1 Stat. ¶ 57 & Ex. 50)  Finally, Plaintiffs received M.B.'s report card, which showed that he had received failing grades in English and Social Studies for the 2002-03 school year.  (Id. ¶ 59 & Ex. 59)

### D. The Proposed 2003-04 IEP

The CSE did not reconvene to consider the additional information concerning M.B.'s academic performance that became available in June 2003.  (Id. ¶ 60) Instead, in July 2003, Plaintiffs were informed that M.B. would not be promoted to seventh grade because he had failed two sixth grade classes and had not attended summer

school.  (Id. ¶ 61 & Ex. 55)  Plaintiffs objected to this decision on August 1, 2003.
(Id. ¶ 62)

On August 6, 2003, the District confirmed that M.B. would not be
promoted to the seventh grade and gave Plaintiffs the final IEP for the 2003-04 school
year.  (Id. ¶ 65; Ex. 60)  The 2003-04 IEP provided for a program of four inclusion
classes per day, one multi-sensory reading period per day, and one writing intervention
period every other day.  (Ex. 60 at 1)  The 2003-04 IEP did not make any provision for
shortened homework assignments.  (See Ex. 60)  Plaintiffs then informed the District that
they were rejecting the 2003-04 IEP and placed M.B. at Kildonan School for the 2003-04
school year.  (Pltf. Rule 56.1 Stat. ¶ 66)

II.      **STANDARD OF REVIEW**

In IDEA cases, "[s]ummary judgment . . . involves more than looking into
disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing
administrative decisions."  T.P. ex rel. S.P., 554 F.3d at 252 (internal quotation omitted).
The Court must perform a "circumscribed" review of the educational decision at issue,
and make a decision that is based on the "preponderance of the evidence," but also "'give
"due weight" to the administrative proceedings, mindful that the judiciary generally lacks
the specialized knowledge and experience necessary to resolve persistent and difficult
questions of educational policy.'"  Id., quoting Gagliardo v. Arlington Cent. Sch. Dist.,
489 F.3d 105, 113 (2d Cir. 2007) and 20 U.S.C. § 1415(i)(2)(C)(iii); see also Cerra v.
Pawling Cent. Sch. Dist., 427 F.3d 186, 191-92 (2d Cir. 2005) ("Although the district
court must engage in an independent review of the administrative record and make a
determination based on a 'preponderance of the evidence,' . . . such review 'is by no
means an invitation to the courts to substitute their own notions of sound educational

policy for those of the school authorities which they review.'" (internal citations

omitted)).

Thus, where the state administrative decisions "implicat[e] educational

policies and practices," <u>Pinn ex rel. Steven P. v. Harrison Cent. Sch. Dist.</u>, 473 F. Supp.

2d 477, 482 (S.D.N.Y. 2007), and are "reasoned and supported by the record," <u>T.P. ex</u>

<u>rel. S.P.</u>, 554 F.3d at 254 (internal quotation omitted), the Court should defer to the

administrative decisions.  <u>Id.</u>  "Because administrative agencies have special expertise in

making judgments concerning student progress, deference is particularly important when

assessing an IEP's substantive adequacy."  <u>Cerra</u>, 427 F.3d at 195.  Thus, the Court may

not reach a decision contrary to the SRO with respect to an "educational policy

decision . . . absent objective evidence in the record suggesting that the SRO has reached

an erroneous conclusion."  <u>Id.</u> at 196.

Further, the Court should "accord the deference . . . traditional on

appellate review" to the state hearing officer's assessment of witness credibility.  <u>J.R. v.</u>

<u>Bd. of Educ. of City of Rye Sch. Dist.</u>, 345 F. Supp. 2d 386, 399 (S.D.N.Y. 2004).

Deference to state administrative decisions is "particularly warranted" where, as here, the

Court's decision is "based solely on the administrative record."  <u>A.C. ex rel. M.C. v. Bd.</u>

<u>of Educ. of the Chappaqua Cent. Sch. Dist.</u>, 553 F.3d 165, 171 (2d Cir. 2009).[10]

## III.   **PROCEDURAL COMPLIANCE**

The first question for the Court is whether Plaintiffs have shown by a

preponderance of the evidence that the 2003-04 IEP should be considered inadequate due

---

[10] Although a district court may consider evidence outside the administrative record, <u>see</u>
20 U.S.C. § 1415(i)(2)(C)(ii) (permitting court to "hear additional evidence at the request
of a party"), the parties have not submitted any such evidence here.

to Defendant's failure to comply with the IDEA's procedural requirements.  <u>T.P. ex rel. S.P.</u>, 554 F.3d at 252.  This "initial procedural inquiry . . . is no mere formality, as adequate compliance with the procedures prescribed [in the IDEA] would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  <u>A.C. ex rel. M.C.</u>, 553 F.3d at 172 (internal quotation marks omitted).  However, "it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA."  <u>Id.</u> (internal quotation marks omitted).  A procedural error does not warrant relief unless it undermines substantial rights.  <u>J.D. ex rel. J.D. v. Pawlet Sch. Dist.</u>, 224 F.3d 60, 69 (2d Cir. 2000).  "Only procedural inadequacies that cause substantive harm to the child or his parents – meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP – constitute a denial of a FAPE."  <u>Matrejek v. Brewster Cent. Sch. Dist.</u>, 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007).

Plaintiffs assert that the 2003-04 IEP was procedurally deficient, and therefore inadequate, because it was developed without a proper annual review of M.B.'s progress under the 2002-03 IEP.  (Pltf. Br. at 7-10)  Defendant contends that the IHO and SRO properly rejected Plaintiffs' procedural deficiency argument because the CSE had sufficient information to assess M.B.'s progress at the March 18, 2003 annual review meeting.  (Def. Br. at 7)  For the reasons stated below, this Court defers to the state administrative decisions on this issue and concludes that Plaintiffs have not demonstrated that the 2003-04 IEP was inadequate due to procedural deficiencies.

A.      **The IDEA's Annual Review Requirement**

Under IDEA, an IEP must be "reviewed periodically, no less than annually, 'to determine whether the annual goals[11] for the child are being achieved,' and to revise the IEP as needed based on the child's progress and anticipated needs."  P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ., 546 F.3d 111, 114 (2d Cir. 2008) (quoting 20 U.S.C. § 1414(d)(4)).  The IEP must be revised "as appropriate to address . . . any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate."  20 U.S.C. § 1414(d)(4)(A)(ii)(I).

B.      **The Administrative Decisions**

At the administrative hearing, Plaintiffs argued that the 2003-04 IEP was procedurally deficient because the 2002-003 IEP was not actually reviewed at the March 18, 2003 meeting, and because the assessment necessary for such an annual review had not yet been completed in March 2003.  (IHO Dec. at 43-44)  The IHO found that there "were sufficient assessment tools at the [March 18, 2003] IEP review to create an appropriate IEP," including:  (1) "quite a few oral reports about the extent of M.B.'s progress" from M.B.'s teachers; and (2) "M.B.'s standardized test scores on the Terra Nova test."  (IHO Dec. at 44-45)  The SRO agreed that "the CSE had conducted a proper review of the student's progress before developing and finalizing the student's 2003-04 IEP."  (SRO at 7)

---

[11] Pursuant to the IDEA, an IEP must include, inter alia, a "statement of measurable annual goals, including academic and functional goals" for the child.  20 U.S.C. § 1414(d)(1)(A)(i)(II).

C.       **The 2003-04 IEP Was Not Inadequate Due To Procedural Deficiencies**

M.B.'s 2003-04 IEP was not developed in strict compliance with the statutory requirements described above.  It is undisputed, for example, that the District had not completed a formal review of the goals and objectives listed in M.B.'s 2002-03 IEP as of the March 18, 2003 "annual review."  (Pltf. Rule 56.1 Stat. ¶ 55; Ex. 44 at 8) There was likewise no discussion of the specific goals listed in M.B.'s 2002-03 IEP at the March 18 meeting; instead, the discussion centered on M.B.'s Terra Nova test scores and whether he was achieving passing grades in his classes.  (See Ex. 44; Ex. BB)  The District did not provide Plaintiffs with an evaluation of M.B.'s success in achieving his IEP's annual goals until June 2003, long after the CSE's March 2003 meeting.  (Pltf. Rule 56.1 Stat. ¶¶ 56-57, 60; Ex. 50)

Plaintiffs, however, have not shown that the District's failure to review M.B.'s IEP goals explicitly at the March 18, 2003 meeting deprived M.B. of a FAPE or deprived them of the ability to participate meaningfully in the IEP process.  All of the objectives in M.B.'s 2002-03 IEP were to be assessed based on the observations of his special education teacher, Lisa Butts.  (Ex. 17 at 5-6)  Butts was present at the March 18, 2003 meeting and assessed M.B.'s performance that year, albeit in an informal fashion that did not assign numerical values to M.B.'s attainment of each IEP goal.  (Ex. 44 at 1-2)  Her oral assessment and those provided by M.B.'s other teachers were fully consistent with the formal IEP assessment provided in June 2003; other than M.B.'s science teacher, no teacher indicated that M.B. had made satisfactory progress during the 2002-03 school year.  (Id. at 2-4)  Similarly, the teachers' oral assessments of M.B.'s class performance were also consistent with M.B.'s end-of-year report card.  (Id. at 4-6)  It was clear from

their comments that M.B.'s failure to complete homework assignments was a significant problem and that he was in danger of receiving failing grades.  (Id. at 4-7)

Plaintiffs have not demonstrated that the CSE's failure to reconvene to conduct a formal end-of-year IEP assessment and to consider M.B.'s end-of-year report card led the committee to evaluate his performance or progress incorrectly.  Nor have Plaintiffs demonstrated that the formal assessment and final report card contained information that would have allowed them to participate more meaningfully in the March 18, 2003 meeting.  Therefore, the Court defers to the IHO's and SRO's conclusions that the 2003-04 IEP was not inadequate for procedural reasons.[12]  See J.D. ex rel. J.D., 224 F.3d at 69 (procedural error does not render IEP inadequate unless it affects child's right to a FAPE); Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 379 (S.D.N.Y. 2006) (district's failure to complete annual review of goal mastery prior to developing next year's IEP did not render IEP inadequate where information contained in annual review was known to participants at development meeting).  See also, e.g., Berger v. Medina City Sch. Dist., 348 F.3d 513, 520 (6th Cir. 2003) (affirming decision that child was not denied a FAPE where IEP did not include required evaluation of child's present level of educational performance; child's performance was in fact being evaluated and teachers and parents were in regular communication); Anderson v. Dist. of Columbia, 606 F. Supp. 2d 86, 91 (D.D.C. 2009) (technical procedural errors in IEP process,

-----

[12] Plaintiffs also argue that the CSE lacked and should have obtained objective data to evaluate M.B.'s performance, particularly in such areas as word recognition and decoding.  (Pltf. Br. at 8)  However, M.B.'s 2002-03 IEP stated that his progress would be measured by the special education teacher's observations.  (Ex. 17)  Plaintiffs have not challenged the adequacy of the 2002-03 IEP and have not cited any case law to support their suggestion that progress in meeting IEP goals must be measured by some kind of test rather than by a teacher's observations.

including failure to have two teachers present at IEP meeting and failure to complete
monthly progress reports, did not render IEP inadequate where committee considered
appropriate information before making a decision about child's IEP and placement).

## IV.   SUBSTANTIVE COMPLIANCE

Although Plaintiffs have not shown that the 2003-04 IEP should be
considered inadequate due to procedural deficiencies in the IEP process, they may still
prevail by showing that the 2003-04 IEP was substantively inadequate.  See Rowley, 458
U.S. at 206-07 (if state has met IDEA's procedural requirements and IEP is substantively
adequate, state "has complied with" the IDEA).  An IEP is substantively adequate if it "is
reasonably calculated to allow the child to receive educational benefits," Mrs. B. v.
Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997) (internal quotation marks
omitted), and is "likely to produce progress, not regression," Walczak, 142 F.3d at 130
(internal quotation marks omitted).  Moreover, the progress must be "meaningful" and
not mere "trivial advancement."  Id. (internal quotation marks omitted); T.P. ex rel. S.P.,
554 F.3d at 254 (same).

Plaintiffs argue that the 2003-04 IEP was substantively deficient because it
was merely "a continuation of the program that had proven ineffective in the prior school
years."  (Pltf. Br. at 13)  Specifically, Plaintiffs assert that the 2003-04 IEP was deficient
in that:  (1) it stated that writing intervention was to be provided "every other day,"
whereas the CSE recommended a daily writing intervention class; (2) the daily Reading
Skills class that M.B. had received in 2002-03 was not provided; (3) it did not reflect that
M.B. should receive after-school one-on-one multisensory reading programming, which
he had received in 2002-03; and (4) it did not address M.B.'s need for after-school
assistance in completing homework assignments or provide for homework or assignment

modification.  (Pltf. Reply Br. at 6-8 (citing Ex. 44, Ex. 60))  Defendant argues that the

IHO and SRO correctly concluded that the 2003-04 IEP was adequate.  (Def. Br. at 8-11)

   As explained below, the IHO concluded that the 2003-04 IEP was

adequate because it provided for a daily writing intervention class and shortened

homework assignments.  (IHO Dec. at 48)  The SRO affirmed the IHO's determination,

holding that the 2003-04 IEP "corrected for any failures in the 2002-03 program."  (SRO

Dec. at 7)  In reality, the 2003-04 IEP provided for neither a daily writing intervention

class nor for shortened homework assignments (see Ex. 60) and thus did not address the

deficiencies in M.B.'s 2002-03 program and its implementation.

  **A.**  **The Administrative Officers' Determinations**
     **Concerning the IEP's Substantive Adequacy**

   The IHO and SRO both recognized that there had been "failings in the

2002-03 [IEP] program."  (SRO Dec. at 7; see also IHO Dec. at 46 ("[T]he parents are

correct that M.B. did not do particularly well in sixth grade . . . ."))  Indeed, the IHO

noted that while M.B.'s grades for the first half of the year were "mostly passing," his

grades "began to drop badly" in the third quarter, and he had failing grades in English,

Reading, Social Studies and Math in the fourth quarter.  (IHO Dec. at 46)

   The IHO found, however, that M.B.'s "diminished grades" resulted from

his failure to complete homework assignments, which in turn was caused by Plaintiffs'

"refusal to allow the shortened assignments" provided for in the 2002-03 IEP.  (IHO Dec.

at 47; see also SRO Dec. at 7 (agreeing with IHO that "one of the major reasons" for

M.B.'s low grades was his "inability to complete homework assignments," which had

been exacerbated by Plaintiffs' "refusal to allow . . . [M.B.'s] teachers to either modify

his assignments or allow . . . [M.B.] to stay after school for a homework study hall" ))

The IHO further found that the reason for M.B.'s regression in reading was the decrease from five to three multi-sensory reading classes per week.  (SRO Dec. at 7; IHO Dec. at 48)

The IHO rejected Plaintiffs' argument that the 2003-04 IEP was essentially the same failed program that had been implemented the prior year, noting that the 2003-04 program differed in two ways:  (1) it "offer[ed] the shortened assignments, including in homework," that had been provided in the 2002-03 IEP but discontinued; and (2) it "recommend[ed] Multi-sensory Reading five times a week, and Writing five days a week as well," whereas after November 1, 2002, M.B. had received those classes only on alternating days.  (IHO Dec. at 48)  The IHO found that M.B. had progressed in earlier years when he had received daily remedial reading, and concluded that M.B. likely would have progressed in 2002-03 if he had received such instruction daily.  (Id. at 49)

Finally, the IHO rejected the testimony of Plaintiffs' expert witness, Dr. Katherine Vafakas Smelter, that M.B. had not progressed in reading since 2000.  (Id. at 49-50)  The IHO found that Dr. Smelter's credibility and conclusions had been undermined because of her assumption that a particular test had been administered to M.B. in 2000, when in fact it had been administered in 2002.[13]  (Id.)

_____

[13] Dr. Smelter found that M.B. performed at the .1 percentile on the WIAT-II reading comprehension test, whereas Dr. Delessio-Neubauer, another psychologist and Dr. Smelter's business partner, had found that M.B. performed at the 47th percentile on a WIAT-II test that Dr. Smelter believed had been administered in 2000.  (IHO Dec. at 50)  Dr. Smelter explained the discrepancy in scores by stating that in 2000, M.B.'s test scores could have been elevated because the test would have been administered using picture cues, due to M.B.'s age.  (Id.)  On cross-examination, however, Dr. Smelter conceded that Dr. Delessio-Neubauer had actually administered the test in 2002.  According to the IHO, Dr. Smelter "was unable to articulately explain the wide discrepancy between the tests."  (Id. at 50)  The IHO found that this testimony damaged Dr. Smelter's credibility.

The SRO concluded that the IHO's findings were supported by the evidence, and agreed with the IHO's finding that the 2003-04 IEP adequately addressed M.B.'s regression in reading and difficulties in completing homework.  (SRO Dec. at 7)

**B.       The 2003-04 IEP Was Substantively Deficient**

Plaintiffs' argument that the 2003-04 IEP was substantively deficient is based on two assertions:  (1) M.B. did not make adequate progress in 2002-03; and (2) the 2003-04 IEP was substantively similar to the program M.B. received in 2002-03 and therefore was not reasonably calculated to allow him to make meaningful progress in 2003-04.  The IHO and SRO rejected the second assertion, finding that the 2003-04 IEP constituted a superior program that addressed the deficiencies in the 2002-03 program M.B. had received.  The record, however, does not support such a finding, and this Court cannot conclude that the 2003-04 IEP was reasonably calculated to provide M.B. with a meaningful educational benefit.

**1.       M.B.'s Lack of Progress in 2002-03**

The undisputed facts concerning M.B.'s performance in 2002-03 show that the services he received that year were inadequate to allow him to make meaningful progress in reading and writing, or to make passing grades in such core subjects as English, Math, and Social Studies.  It is likewise undisputed that by the end of the 2002-03 school year, M.B. had not achieved or made satisfactory progress toward any of his 27 IEP goals relating to reading and writing.  (Pltf. Rule 56.1 Stat. ¶ 57; Ex. 50)  Moreover,

---

(Id. at 49-50)  Having reviewed the transcript of Dr. Smelter's testimony concerning M.B.'s WIAT-II scores, the Court defers to the IHO's evaluation of her credibility.  See J.R., 345 F. Supp. 2d at 399 (court should accord traditional deference to hearing officer's credibility assessments).

the single standardized test relied on by Defendant to measure M.B.'s progress in reading showed regression.  (Pltf. Rule 56.1 Stat. ¶¶ 44, 53; Ex. 44 at 1)

Where, as here, a child is educated in a mainstream class, "the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress."  Walczak, 142 F.3d at 130; Rowley, 458 U.S. at 207 n.28 ("When the handicapped child is being educated in the regular classrooms of a public school system, the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit.").  In this case, M.B. failed two core classes (English and Social Studies) for the year and was deemed ineligible for promotion to seventh grade.  (Pltf. ¶¶ 59, 61; Ex. 59)  The preponderance of the objective evidence concerning M.B.'s performance during the 2002-03 school year supports the conclusion that the 2002-03 IEP did not allow him to make meaningful progress in sixth grade.[14]  See Mrs. B., 103 F.3d at 1121 (district court properly found placement inadequate where child had "failed to meet nearly all of the objectives set in her IEP and nearly all of her grades were unsatisfactory").

---

[14] The IHO found that "[s]ome teacher testimony indicated that M.B. did ma[k]e some progress during the 2002-03 school year," and also noted that the Terra Nova test administered in January 2003 "indicated an increase in Science and Math grade equivalent, a modest increase in Social Studies grade equivalent, and an increase in language grade equivalent."  (IHO Dec. at 46)  However, as the IHO also found, M.B.'s grades "began to drop badly" in the third and fourth quarters, after the Terra Nova test had been administered.  (Id. at 46)  Indeed, M.B. failed Reading Skills and Social Studies in the third quarter, and then failed English, Reading, Social Studies and Math in the fourth quarter.  (Id.)

### 2.     The 2003-04 IEP Did Not Remedy All of the
###         Deficiencies in the 2002-03 Program

The IHO found, and the SRO agreed, that M.B.'s declining academic

performance in 2002-03 resulted from:  (1) the change in his schedule from daily multi-

sensory reading to alternating multi-sensory reading and writing intervention; and (2) the

decision not to provide M.B. with shortened assignments or to require him to attend after-

school study hall in order to complete his homework.[15]  (IHO Dec. at 47-48; SRO Dec. at

7)  The IHO and SRO also found that the objective evidence indicated that M.B.'s failing

grades stemmed from the fact that he had not been given shortened assignments and thus

was not able to complete his homework.  (IHO Dec. at 47-48; SRO Dec. at 7)  The Court

agrees that both of the above findings are supported by a preponderance of the

evidence.[16]  Unfortunately, the 2003-04 IEP does not adequately address M.B.'s

difficulties in writing and in completing his homework.

### a.     <u>Reading</u>

To address M.B.'s needs in the area of reading, the 2003-04 IEP provided

for five 42-minute periods of multi-sensory reading instruction in a group of no more

than five children, as opposed to the every-other-day classes and two half-hour sessions

---

[15] Plaintiffs object to the IHO's finding that the District deviated from the 2002-03 IEP at their request.  The IHO and SRO's factual determination on this point is supported by the record, but as the SRO acknowledged, the key issue is not whether the parents requested a change in their child's educational program in 2002-03, but rather whether the District has met its responsibility to propose and provide adequate services for the 2003-04 school year.  (SRO Dec. at 8 n.4)  More precisely, the question for this Court is whether Plaintiffs have shown by a preponderance of the evidence that the District failed to meet that responsibility for the 2003-04 school year.

[16] <u>E.g.</u>, Tr. 309:11-15 (multi-sensory reading teacher stating that she "first became aware that M. wasn't progressing as [she] had wanted him to" in November when he started attending class every other day).  <u>See also</u> <u>supra</u> pp. 6-7 (summarizing discussion of M.B.'s progress at March 18, 2003 CSE meeting as reflected in Exhibits 44 and BB).

of one-on-one tutoring per week that M.B. had received in 2002-03.  (See supra pp. 4-6,

9)  The IHO found that M.B.'s multi-sensory reading teacher gave credible testimony that

M.B. had been making progress until his classes were reduced from five times per week

to an every-other-day schedule.  (See supra p. 20)  The IHO also found that Plaintiffs'

primary evidence concerning the inadequacy of the reading program – their expert's

testimony concerning M.B.'s regression in reading – was not credible.  (See supra p. 17

& n. 13)  The IHO's finding that the 2003-04 IEP was reasonably calculated to allow

M.B. to make progress in reading is supported by the record[17] and warrants deference by

this Court.[18]

### b.   Homework Completion

With respect to M.B.'s difficulties in completing his homework, the IHO

found that the 2003-04 IEP was adequate because it provided for shortened assignments,

an aspect of the 2002-03 IEP that had been discontinued during the 2002-03 school year

at the parents' request.  (Id. at 48)  The IHO, however, did not provide a record cite for

his finding that the 2003-04 IEP included a provision regarding shortened assignments,

and this Court has not found any support for such a finding in its own review of the

---

[17] See, e.g., Tr. 310:9-14 (testimony of multi-sensory reading teacher that M.B. made progress in reading when he attended her class every day); Ex. 9 (end-of-year evaluation by multi-sensory reading teacher noting improvements in M.B.'s reading fluency, particularly in first half of year).

[18] The IHO did not explicitly address the fact that:  (1) M.B. received one hour of reading tutoring at home each week during 2002-03, whereas the 2003-04 IEP did not provide for home tutoring; and (2) M.B. would not be in a regular "reading skills" class in 2003-04, because he had passed that class as a sixth grader in 2002-03.  (See Ex. 60)  Plaintiffs, however, have not cited any objective evidence in the record indicating that these differences would materially affect M.B.'s ability to make progress in his reading. Therefore, the Court will defer to the IHO's decision that, considering all of the evidence concerning M.B.'s past performance with respect to reading, the 2003-04 IEP was reasonably calculated to allow him to receive a meaningful educational benefit.

record.  The Defendant has likewise not pointed to any evidence supporting such a

finding and does not argue in its Memorandum of Law that the 2003-04 IEP provides for

shortened homework assignments.  (See Def. Br. at 9-10 (describing 2003-04 IEP)).

Indeed, the documentary evidence flatly contradicts the IHO's finding.  The 2003-04 IEP

makes no reference whatsoever to shortened assignments (Ex. 60 at 1-2), whereas the

2002-03 IEP lists "[r]educe length of assignments" under "Program Modifications and/or

Supports for Personnel."  (Ex. 17 at 1)  The minutes and transcript of the March 18, 2003

CSE meeting reveal that the only program modifications discussed by the CSE for the

2003-04 school year relate to testing, not to homework or other assignments.  See Ex. BB

at 17-18 (rejecting proposed modification that M.B.'s tests be read to him and accepting

proposed modification that he receive additional time for tests); Ex. 44 at 6-8 (same).

   Because the IHO's finding of adequacy with respect to the homework

issue – endorsed by the SRO – was based on a factual finding about the 2003-04 IEP that

has no support in the record – i.e., that it provided for shortened homework assignments –

there is no reason for the Court to defer to the state administrative decisions concerning

this issue.  Cf. Gagliardo, 489 F.3d at 114 (IHO finding was entitled to deference because

it was "reasoned and supported by the record" (emphasis added)).

   The Court's review of the evidence indicates that while the CSE

participants understood that M.B.'s failure to complete homework assignments was a

major factor contributing to his failing grades, they did not make any recommendations to

address that problem.  (See supra pp. 8-9)  Although a new objective relating to

homework completion was added to the 2003-04 IEP – "[c]omplete school assignments

with 80% mastery, evaluated by utilizing recorded observations, as assessed by the

service provider, by the end of the school year" (Ex. 60 at 4) – Defendant has not pointed

to any evidence showing that M.B. could reasonably be expected to make progress

toward achieving this objective without the provision of related services or program

modifications in the IEP.  Accordingly, this Court concludes that the 2003-04 IEP did not

provide for any different services or program modifications than M.B. received in 2002-

03, and therefore did not adequately address M.B.'s difficulties in completing his

homework in a manner reasonably calculated to allow him to make meaningful

progress.[19]  See Bd. of Educ. of Frederick County v. I.S. ex rel. Summers, 325 F. Supp.

2d 565, 587 (D. Md. 2004) (affirming administrative judge's finding that IEP was

inadequate where student had made at most "trivial" progress under previous IEP and

new IEP proposed "virtually the same" program (internal quotation marks omitted));

Evans v. Bd. of Educ. of the Rhinebeck Cent. Sch. Dist., 930 F. Supp. 83, 88, 100-02

(S.D.N.Y. 1996) (finding IEP substantively inadequate where it was "substantially the

same" as IEP for previous year, when child had failed all of his classes, and there was no

evidence that the two proposed service changes would give child an educational benefit).

------------------------------------------------

[19] Defendant argues that under Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377 (2d Cir.
2003), the Court should defer to the state administrative decisions in all respects, because
"the actual issue in dispute is the educational methods and services to be utilized by the
District in addressing the student's learning disability."  (Def. Br. at 3-4)  The issue in
dispute, however, is not whether, as in Grim, one method of addressing a disability
should be preferred over another.  See Grim, 346 F.3d at 383 (holding that lower court
had erred in weighing conflicting expert testimony and deciding, contrary to state
administrative officers, that child "must be educated using a single educational
methodology in a fully segregated environment").  Instead, the critical issues here are
whether:  (1) the IHO and SRO decisions are entitled to deference even though they are
premised on a faulty understanding of a key aspect of the factual record; and (2) M.B.'s
2003-04 IEP can be considered adequate when it did not suggest any method for
addressing M.B.'s educational needs other than through the provision of the same
services and program modifications (or lack thereof) that had proven inadequate the
previous year.  (See also infra pp. 18-26)

### c.   <u>Writing</u>

The IHO's conclusion that the 2003-04 IEP adequately addressed M.B.'s writing deficiencies is similarly based on an erroneous characterization of the 2003-04 IEP – namely, that it provided for writing intervention five times per week.  (IHO Dec. at 48)  Although that was the program recommended by the CSE (Ex. 44 at 1-2, 8), the 2003-04 IEP clearly states that writing intervention would be provided <u>every other day</u>, not five times per week (Ex. 60, "Recommended Programs and Services").[20]  While the SRO – in contrast to the IHO – correctly portrayed the 2003-04 IEP on this point in upholding the IHO's decision, the SRO did not acknowledge that the IHO's decision relied on an incorrect characterization of the 2003-04 IEP as providing daily writing intervention.  (SRO Dec. at 7)

This Court cannot ignore the IHO's misunderstanding of the writing program offered in the 2003-04 IEP.  Absent the IHO's misrepresentation of the writing program in the 2003-04 IEP, there is no evidentiary basis to find – as the IHO found – that the 2003-04 IEP was "not the same as the program that was implemented the prior year" with respect to writing.  (IHO Dec. at 48)  Because the IHO's decision that the

_____

[20] The District does not dispute that the 2003-04 IEP only provided for a writing class every other day.  <u>See</u> Silveira Aff. ¶ 7 (describing 2003-04 IEP as providing for "daily attendance in a multisensory reading class and writing instruction class <u>every other day</u>" (emphasis added)).  However, the District incorrectly states that the IHO recognized that the 2003-04 IEP did not provide for daily writing instruction.  (<u>Id.</u> (citing SRO Dec. at 8, IHO Dec. at 45-51))  To the contrary, while the IHO correctly described the 2003-04 IEP in the factual section of his decision (IHO Dec. at 40 (citing Ex. 60 and stating that "[t]he IEP for 2003-2004 indicates . . . Writing intervention every other day)), in the "Findings" section of his decision, the IHO incorrectly stated that the 2003-04 IEP "recommend[ed] Writing five days a week" and used this mistaken fact to justify his decision that the 2003-04 IEP was adequate (IHO Dec. at 48).  Indeed, the IHO mistakenly relied on this alleged provision of the 2003-04 IEP in explaining how the 2003-04 program remedied the deficiencies in the 2002-03 program.  (<u>Id.</u>)

2003-04 IEP was adequate as to writing is based entirely on the erroneous finding that the
2003-04 IEP provides for daily writing intervention, the IHO's decision is not "supported
by the record" and is not entitled to deference.[21]  Gagliardo, 489 F.3d at 114.

Setting aside the IHO decision, the question remains whether the evidence
supports a finding that the 2003-04 IEP adequately addressed M.B.'s writing needs.  The
Court concludes that the 2003-04 IEP was inadequate in this regard.  It is clear from the
record that M.B.'s writing deficiencies were a critical area of concern.  For instance, at
the March 18, 2003 annual review, M.B.'s special education teacher stated that she was
"concerned about his writing abilities" (Ex. BB at 2; Ex. 44 at 1); M.B.'s reading teacher
stated that his "weakest areas" were "writing and spelling" (Ex. BB at 5; Ex. 44 at 2); and
M.B.'s writing teacher identified spelling and editing in particular as one of M.B.'s
"biggest problems" (Ex. BB at 6; Ex. 44 at 4).  See also Ex. BB at 6 and Ex. 44 at 4
(assistant superintendent noting that spelling was "one of the most difficult areas [for
M.B.] to remediate, so he does need help").  Furthermore, it is undisputed that M.B.'s
writing teacher evaluated him at the end of the 2002-03 school year as not having tested
out of remedial writing, and that M.B. did not make satisfactory progress with respect to
any of the writing-related goals in his 2002-03 IEP.[22]  (Ex. J; Ex. 50)

---

[21] If the SRO had acknowledged that the IHO's decision was based on a faulty factual
premise, and had then independently found that the program actually provided by the
2003-04 IEP – writing intervention every other day – was adequate, the Court would
need to consider whether deference to the SRO was warranted.  In this case, however, the
SRO did not acknowledge the factual error in the IHO's decision.  Instead, the SRO
simply corrected the IHO's error without comment and stated that he agreed with the
IHO's determination.  Given this record, there is no reason for this Court to treat the
SRO's decision as an independent analysis of whether the 2003-04 IEP was adequate.

[22] Consistent with these assessments, M.B.'s writing deficiencies were emphasized in the
2003-04 IEP's description of his disability.  In addition to repeating the 2002-03 IEP's

Despite the CSE's evident concern about M.B.'s writing skills and M.B.'s failure to achieve any of his 2002-03 writing goals, the 2003-04 IEP provides for the <u>same</u> writing program that M.B. had received since November 1, 2002 – namely, a writing intervention class every other day.  (<u>See</u> <u>supra</u> pp. 5, 9 & Ex. 60)  This provision was included even though the CSE had recommended a <u>daily</u> writing intervention class for M.B. in 2003-04.  (Ex. BB at 20 (assistant superintendent concluding March 18, 2003 meeting by stating:  "And writing intervention we are looking at 5 times a week . . . .  So that's what we are recommending for his program for next year."))  Thus, the preponderance of the objective evidence supports the conclusion that the 2003-04 IEP was not reasonably calculated to allow M.B. to make meaningful progress with respect to his writing and spelling goals.  <u>See</u> <u>I.S. ex rel. Summers</u>, 325 F. Supp. 2d at 587 (IEP inadequate where it was "virtually the same" as IEP under which student had made at most "trivial" progress); <u>Evans</u>, 930 F. Supp. at 88 (finding IEP substantively inadequate where it proposed only two changes from previous inadequate IEP and there was no evidence that two proposed service changes would give educational benefit).

---

statement that M.B. has "a significant delay in reading decoding and language skills which inhibits progress in the general education curriculum," the 2003-04 IEP further states that "[t]he student has a learning disability in the areas of reading, <u>spelling and writing</u>."  (Ex. 60 (2003-04 IEP) (emphasis added); <u>see also</u> Ex. 17 (2002-03 IEP))

## **CONCLUSION**

For the reasons stated above, Plaintiffs' motion (Docket No. 15) is

GRANTED, and Defendant's motion (Docket No. 19) is DENIED.  The Clerk of the

Court is directed to enter judgment in Plaintiffs' favor ordering Defendant to reimburse

Plaintiffs for the tuition they paid to Kildonan School for M.B. for the 2003-04 school

year.

Dated: New York, New York          SO ORDERED.
      August 24, 2009

Paul G. Gardephe
United States District Judge

27